# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **SALLY JOANNE MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00541** |
| | ) | **Judge Aleta A. Trauger** |
| **KILOLO KIJAKAZI,** | ) | |
| **Commissioner, Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED MEMORANDUM

Plaintiff Sally Joanne Martin brings this action under 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. The Magistrate Judge issued a Report and Recommendation ("R&R") (Doc. No. 23), recommending that the decision of the Social Security Administration ("Agency") be affirmed and that the plaintiff's Motion for Judgment Upon the Administrative Record (Doc. No. 17) be denied. Now before the court are the plaintiff's timely Objections (Doc. No. 24) to the R&R.

For the reasons discussed herein, the court finds that the Agency's decision failed to properly assess the evidence in the record and that the denial of benefits is not supported by substantial evidence. Because evidence of disability is strong and there is very little substantial proof to the contrary, the court will reject the R&R, grant the plaintiff's Motion for Judgment, reverse the Agency's decision, and order an immediate award of benefits, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.     PROCEDURAL HISTORY

Martin filed her application for DIB on February 8, 2018, alleging disability beginning on August 12, 2017, resulting from bipolar disorder, post-traumatic stress disorder and panic disorder, anxiety with symptoms of obsessive compulsive disorder, personality disorder, non-alcoholic fatty liver disease, irritable bowel syndrome, a first-degree heart block, hypertension, and high cholesterol. (Doc. No. 77.[1]) The application was denied initially and on reconsideration. (AR 93, 115.) After a hearing conducted on June 17, 2019, at which the plaintiff appeared with counsel and testified, Administrative Law Judge (ALJ) Michelle Thompson issued a decision unfavorable to the plaintiff on July 30, 2019. (AR 15–25.)

The ALJ found that Martin met the insured status requirements of Title II of the Social Security Act through December 31, 2020 and that she had not engaged in substantial gainful activity during the period from her alleged onset date of August 17, 2017 through the date of the hearing. (AR 17.) The ALJ accepted as a factual matter that Martin suffers from severe impairments, including "hypertension; obesity; insomnia; obstructive sleep apnea; gastro-esophageal reflux disease (GERD); arterial occlusive disease; depression; anxiety; obsessive compulsive disorder; posttraumatic stress disorder (PTSD); and bipolar disorder." (AR 17.) As relevant here, the ALJ found that the plaintiff's mental impairments, considered singly and in combination, did not meet or medically equal in severity one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically referencing Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and

---

[1] Page number references to the administrative record are consistent with the Bates stamp number at the lower right corner of each page.

stressor-related disorders).[2] (AR 18.) The ALJ rejected the plaintiff's treating psychologist's assessment that the plaintiff's condition precluded full-time work and, instead, concluded that the plaintiff had the residual functional capacity (RFC) to perform a limited range of light work as defined in 20 C.F.R. § 404.1567(b). Specifically, she found that the plaintiff could:

> lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours in an 8-hour workday; sit 6 hours in an 8-hour workday; must alternate between sitting and standing every hour for 10 minutes without interruption in pace or leaving the work-station; must avoid concentrated exposure to extreme temperatures, to vibration, and to hazards, such as machinery, heights, etc.; can understand and perform simple instructions and tasks; can occasionally interact with coworkers and supervisors; no work with the general public; and can adapt to occasional changes in the workplace.

(AR 20.)

The ALJ found that the plaintiff has past relevant work as a general duty nurse and community health staff nurse but that the demands of this work exceeded her RFC. (AR 23.) Nonetheless, based on the RFC and the testimony of a qualified vocational expert (VE) at the hearing, and considering the plaintiff's age (50 at the time of the hearing), education, and work experience, the ALJ concluded that jobs existed in significant numbers in the national economy that the plaintiff could perform, including the jobs of small parts assembler, inspector and hand packager, and laundry worker. (AR 24.) The ALJ therefore concluded that the plaintiff was not disabled during the relevant time frame.

The Appeals Council denied review on May 22, 2020 (AR 1–6), making the ALJ's decision the final Agency decision.

The plaintiff filed her Complaint initiating this action on June 25, 2020. (Doc. No. 1.) The

---

[2] The Listing of Impairments, set forth in Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a).

Agency filed a timely Answer (Doc. No. 12), denying liability, and a complete copy of the Administrative Record (Doc. No. 13). On October 1, 2020, the plaintiff filed her Motion for Judgment Upon the Administrative Record and supporting Brief. (Doc. Nos. 17, 18.) The Agency filed a timely Response (Doc. No. 21), and the plaintiff filed a Reply (Doc. No. 22). The Magistrate Judge thereafter issued her R&R (Doc. No. 23), recommending that the plaintiff's motion be denied and that the Agency's decision be affirmed.

Now before the court are the plaintiff's Objections to the R&R. (Doc. No. 25.) The Agency filed a Response (Doc. No. 25), arguing that the Magistrate Judge properly evaluated the ALJ's decision under the prevailing legal standards and that the R&R should be adopted.

## II.    STANDARD OF REVIEW

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a proper objection is made. Fed. R. Civ. P. 72(b)(1)(C); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). In conducting its review of the objections, the district court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

In Social Security cases under Title II or Title XIV, the court's review of an ALJ's decision is limited to a determination of whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); *see* 42 U.S.C. § 405 (g) (2012) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

Substantial evidence has long been defined as "more than a mere scintilla. It means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *see also McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 521 (6th Cir. 2008) (stating that substantial evidence is "more than a scintilla of evidence but less than a preponderance") (internal quotation marks and citation omitted); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (same).

"The substantial evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "Therefore, if substantial evidence supports an ALJ's decision, the court defers to that finding, 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Id.* (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

The plaintiff argued in her Brief in Support of her Motion for Judgment on the Administrative Record, and argues again in her Objections to the R&R, that (1) the ALJ "failed to properly consider and give appropriate weight to the opinion evidence from the Plaintiff's treating psychologist and other treating providers"; and (2) the ALJ "failed to properly credit the Plaintiff's statements about her limitations and improperly found that her allegations are inconsistent with other evidence of record." (Doc. No. 18, at 7; *see also* Doc. No. 24, at 1, 6.) The court considers these arguments *de novo*, applying the "substantial evidence" standard articulated above.

### A. The Plaintiff's Mental Health Treatment Records

The plaintiff takes issue, primarily, with the ALJ's assessment of the opinion of Dr. Robert Berberich, Ed.D., a clinical psychologist. The record reflects that the plaintiff received counseling and therapy for depression and other mental health issues from Dr. Berberich approximately every two to four weeks beginning in late 2016 and continuing through the date of the ALJ's decision.

(*See* AR 283–84 (list of appointment dates).) She was seen and treated at the Mental Health Cooperative (MHC) by various advanced practice nurse practitioners for medication management every four to six weeks during the same timeframe. (AR 39.)

In June 2017, shortly before the alleged onset date of August 17, 2017, the plaintiff had a medical management appointment at MHC. At that time, she was on lithium, Effexor XR, buspirone, and mirtazapine (Remiron). (AR 313–14.) On that date, she reported that she believed her medications were working and that was "hanging in there," even though she had a "lot going on medically" and was still suffering "bouts of depression" and high anxiety. (AR 313.) However, the MCH progress notes reflect that, by September 2017, she reported increased anxiety and depression, frequent crying spells, and intolerable side effects from lithium. She was taken off lithium and put on lamotrigine (Lamictal) instead, and her other medications were continued. While her mood was depressed and her affect dysphoric, she was nonetheless observed to have linear thought processes and no delusions. (AR 315.) A month later she called MHC to report that her medications were not working and that her insomnia was bad and her depression worse. Her dosage of Lamictal was increased. (AR 317.) At her medical management visit to MHC in November 2017, she reported not sleeping well, with racing mind and disconnected thoughts, feelings of hopelessness and ever-present anxiety. She was not able to feel joy over a new granddaughter or sadness at the death of her sister. (AR 317.) On physical examination during that appointment, her affect was "constricted and emotionally congruent," but she nonetheless had good eye contact, and her orientation and cognition were fine. (AR 318.) Her medications were continued with a note to increase Lamictal again after another fourteen days. (*Id.*) Similarly, at her medical management appointment in December, she reported that nothing made a difference, her depression was worsening, with mood swings and irritability, anxiety, crying spells, feelings of

hopelessness, decreased energy and motivation, poor and interrupted sleep. She presented with a flat affect and depressed moot, but she was nonetheless noted to be "calm and cooperative with good eye contact"; her memory was "intact," and her insight and judgment were "fair." (AR 321.) The practitioner discontinued Lamictal and started her on lurasidone (Latuda) instead, while continuing her other medications.

At her January 2018 medical management appointment at MHC, she reported that her depression and anxiety were worse, and her dosage of Latuda was increased. (AR 324.) At her appointment in early February 2018, she reported that she was "doing okay," but, at the same time, she stated that Latuda had not "done anything"; her mood was still "depressed and anxious," and she continued to report constantly racing thoughts, frequent mood swings, irritability, crying spells, no motivation, poor sleep and nightmares. (AR 325.) She still managed to present with clean clothing and appropriate grooming, was calm and cooperative, with linear thought processes, intact memory, and fair insight and judgment. The plan was to increase Latuda again while keeping her on her other medications. (*Id.*) In the same treatment note, the plaintiff's practitioner documented the plaintiff's past unsuccessful trials with numerous other antidepressant medications, including Zoloft, Prozac, Celexa, Wellbutrin, Abilify, and Zyprexa. (*Id.*) In March 2018, there was "no change" in her symptoms. (AR 340.) Her provider again noted the plaintiff's history of unsuccessful treatment on a number of different medications. She was taken off Latuda and started on oxcarbazepine (Tripletal) 300 mg. (*Id.*)

Although the plaintiff apparently first began treatment with Dr. Robert Berberich in 2016, his first treatment note in the Administrative Record is dated March 20, 2018,[3] which references

---

[3] It is unclear why earlier treatment records from Dr. Berberich are not part of the Administrative Record. The court speculates that the plaintiff (or her counsel) may have believed they were already part of the record since they had been submitted in connection with the plaintiff's

visits in January and February 2018 as well. (AR 343.)[4] Consistently with the medical management notes from MHC for the same timeframe, Dr. Berberich observed that the plaintiff "[c]ontinues to be withdrawn and reclusive," that she only got out for doctors' appointments and to see her sister, did not engage in cooking or cleaning, maintained "essential hygiene only," and had "dwindling" motivation and increased resistance to treatment. (AR 343.) She was experiencing "severe" symptoms including angry outbursts, anxiety and worry, anxiety between panic attacks, brooding over the past, depersonalization, difficulty concentrating, and feelings of hopelessness. (AR 344.) He expressed the opinion that she was suffering from impairments of her ability to function, including "severe" difficulty in maintaining relationships, severe difficulty in maintaining attendance, as it would be "highly subject to interference from both psychological as well as physical symptoms," severe difficulty in carrying out "any level of instruction" due to her anxiety level. (AR 344/493.) He noted that "[c]hange is anathema for Ms. Martin." (*Id.*) He opined that she would understand but likely fail to recall simple instructions. (*Id.*)

On physical exam, her mood was anxious and affect constricted, but she was oriented for person and place and able to "present[] herself in an appropriate fashion" with "fair" eye contact, "fair" judgment. (AR 344-45.) At the same time, her speech was "characterized by loosening associations," her remote and recent memory appeared mildly impaired, and, although her judgment was fair, "trust in her own judgment is poor," and her attention span was "significantly limited." (AR 345.)

---

previous disability application. (*See* AR 58, Ex. B1A (Aug. 16, 2017 denial of March 2016 applications for DIB and Supplemental Security Income).)

[4] The record actually contains two reports dated March 20, 2018 from Dr. Berberich. One of them is a "Progress Note" (Ex. B19F, AR 492), while the other is titled "Summary Report" (Ex. B6F, AR 343). Other than the difference in title and the fact that the Summary Note is signed and dated, they appear to be identical.

One section of this report reflects boilerplate to which Dr. Berberich gave little attention, as it noted, incorrectly, that the patient presented with "mild" psychosis; that the patient's "strengths include consistencey [sic] in his [sic] presentation of symptoms," did not use nicotine (when the record clearly reflects that the plaintiff was a pack-per-day smoker), that her "current health is very good" (although the plaintiff was concurrently seeking treatment for obstructive sleep apnea as well as vascular disease causing foot pain and numbness (*see* AR 351–52)), and her height was "0 ft 0 in." (AR 345.)

Otherwise, however, the plaintiff's medication management notes from MHC and Dr. Berberich's treatment notes over the course of the next fourteen months are largely consistent with each other and reflect some fluctuations but little overall improvement in the plaintiff's condition. For instance, in June 2018, the plaintiff noted during her medical management appointment at MHC that her mood was "more stable" but her depression was worse and she was staying in bed all day, which was corroborated by her boyfriend. (AR 420.) She was experiencing suicidal ideation, with thoughts that life would be better if she were dead, but she denied having a concrete plan to do away with herself. (AR 420.) In July 2018, Dr. Berberich noted that the plaintiff had "fluctuating but frequent" problems with concentration, episodic intense continuing anxiety, chronic depression, and suicidal ideation. (AR 508.) His opinions regarding her impairments and mental status are similar to those from previous progress notes. (AR 509.) Her medical management notes from MHC for August and September 2018 show that she was still having crying spells, racing thoughts, and suicidal ideation; she was angry, tearful and depressed, sleeping all day and awake all night. (AR 469, 471, 510.) In October 2018 she reported that she was "doing better" and "attempting to remain medication compliant" (AR 475), but by December she reported

more panic attacks, feeling more depressed, anxious, and irritable, and having suicidal ideation without a plan. (AR 476.)

Dr. Berberich noted in February 2019 that the plaintiff's worry was "less persistent" but that she was "medicated intensively to the point of not being able to concentrate. However either way there is a concentration problem." (AR 524.) His opinions regarding her mental status and impairments were largely unchanged. (AR 524.) The MHC note for March 2019 stated that she continued to not sleep well and was feeling depressed, with decreased energy and motivation. (AR 480.)

The course of the plaintiff's medication management at MHC over the same timeframe reflects ongoing adjustment of her medications due to a general lack of efficacy or intolerable side effects. For instance, her June 2018 medication management note indicates that her Tripletal dosage was doubled, from 300 mg twice a day to 600 mg twice a day; the medication desvenlafaxine succinate ER (Pristiq) 50 mg, another antidepressant, was added; and she began tapering off of Effexor. (AR 420.) In August 2018, she had fully tapered off of the Effexor and had been taking Pristiq every day for two weeks, but she continued to feel "depressed, angry, and tearful. Sleeping is sporadic. States that she is staying up most nights and sleeping all day." (AR 422.) In September 2018, her symptoms were unchanged, and her medications were changed again. She was instructed to continue taking Pristiq but to taper off of Tripletal, reduce Remeron, increase buspirone, and start on quetiapine fumarate (Seroquel) tablets. (AR 472.) In October, the dosage of Seroquel was increased from 100 mg per day to 300 mg per day. (AR 474.) In December 2018, Seroquel was increased to 400 mg per day, and another medication was added: benztropine mesylate (Cogentin), to treat the side effect of restless legs caused by her other medications. (AR 476–77.)

In January, she reported sleeping 6 to 12 hours per day but also being constantly hungry, likely because of the medication Remeron. She and the MHC practitioner discussed stopping Remeron. In March 2019, she reported not eating as much without the Remeron but also not sleeping as well. She continued to feel depressed with decreased energy and motivation, with some suicidal ideation but no concrete plan. (AR 481.) Her Seroquel was increased to 600 mg per day. (AR 482.) In April 2019, the plaintiff complained that the increase in Seroquel made her blood pressure drop and made her feel so dizzy that she had dropped it back to 300 mg per day. This change reduced the dizziness, but her mood was still "not good" and her panic attacks had increased. (AR 483.) She was not sleeping well and was experiencing nightmares; she had some suicidal ideation but felt "like she will got to Hell and wants to see her grandchildren grown up." (*Id.*) She was taken off Seroquel and tried on risperidone (Risperdal) instead. (AR 484.)

On May 28, 2019, shortly before the hearing with the ALJ, the plaintiff reported that she did "not notice anything different from the Risperdal," was sleeping only three hours per night, and had thought about taking pills just the day before but did not only because "she wants to live" and her "grand kids bring her joy." (AR 485.) She had experienced "losing track of time a few times since [her] last visit." (*Id.*) On this visit, her Pristiq dosage was doubled from 50 mg per day to 100 mg per day, and her Risperdal dosage was increased from 2 mg to 3 mg per day. (AR 486.)

### B.    Opinion Evidence in the Record

In June 2019, Dr. Berberich completed a Mental Evaluation Report in which he noted that the plaintiff was neatly and cleanly dressed, polite and reserved while exhibiting self-doubt and uncertainty. (AR 537.) He reported the same symptoms he had been observing in his treatment notes since the spring of 2018: restlessness, irritability, difficulty concentrating, sleep disturbance, unwillingness to socialize. His diagnoses included anxiety disorder with compulsive traits, PTSD, and bipolar disorder, and he expected that her diagnoses and symptoms together resulted in "such

marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate. (ARE 538.) He also believed that she would not be able to carry out very short and simple instructions (much less detailed instructions), maintain attention for a two-hour segment on a regular basis, maintain regular attendance or be punctual at a job, sustain an ordinary routine without special supervision, complete a normal workday or workweek without interruption from psychologically based symptoms, perform at a consistent pace, accept and respond appropriately to criticism from supervisors, get along with coworkers or peers, or respond appropriately to routine changes in work setting. (AR 539.) He also opined that she could not interact appropriately with the general public. (AR 539.) He noted that she was capable of asking questions and, in fact, did so with "maddening frequency and rapidity" but to no "useful" effect. (AR 540.)

The state agency decision denying the plaintiff's claim at the initial level, dated June 4, 2018, referenced the evidence reviewed in reaching a decision as including some of the records from Dr. Berberich and MHC, as well as records relating to an assessment and colonoscopy related to upper abdominal pain by Dr. Brett Inglis in the Fall of 2017; the plaintiff's eye examination in December 2017; an assessment and sleep study by Dr. Stephen Heyman, who diagnosed obstructive sleep apnea in the Spring of 2018; treatment notes from vascular specialist, Dr. Alan Werner, who assessed and treated the plaintiff for bilateral foot and leg pain and numbness beginning in April 2018; and evidence submitted by the plaintiff, including her own Function Reports and letters from her daughter and her boyfriend. (AR 77–81, Ex. B2A.)

Based on this evidence, the state agency reviewer opined that the plaintiff was limited in her ability to perform work-related activities, but not as limited as she claimed. As relevant here, the reviewer assessed the plaintiff as not significantly limited in her ability to perform activities

within a schedule, maintain regular attendance, and be punctual within customary tolerances or to sustain an ordinary routine without special supervision; moderately limited in her ability to maintain attention and concentration for extended periods; not significantly limited in her ability to work in coordination with or proximity to others and to make simple work-related decisions; moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a persistent pace. The reviewer ultimately concluded that the plaintiff was nonetheless "[a]ble to maintain attention, concentration, persistence and pace for above tasks, with approp[riate] breaks, despite periods of increased signs and s[ymptom]s." (AR 88.) The reviewer also found the plaintiff to be moderately limited in her ability to interact appropriately with the general public and in her ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes but could do so well enough to work, "despite periods of increased signs and s[ymptom]s," and could "adapt to infrequent changes in the workplace." (AR 89.) The reviewer indicated that she adopted an ALJ decision issued in August 2017, denying an earlier application for benefits filed by the plaintiff. The denial of benefits on reconsideration, dated September 21, 2018, is basically identical. (AR 96–111, Ex. B5A.)

In considering the medical opinions in the record pertaining to the plaintiff's mental limitations, the ALJ opinion issued in July 2019 found the state agency opinions to be persuasive as "well supported by the objective medical evidence[,] well explained [and] consistent with all other evidence in the record by all other sources," except for the plaintiff's own allegations, her friend's report, and the opinion of Dr. Berberich. (AR 22 (citing Ex. B2A, B5A).) In assessing Dr. Berberich's opinions, however, the ALJ found them to be unpersuasive, because they "were neither well supported nor well explained," and further found the treatment records to be

"internally inconsistent, because he assesses severe limitations but diagnoses mild impairments." (AR 22 (citing B6F/2–3, B6F, B19F).) The ALJ also believed that Dr. Berberich's assessments were inconsistent with other providers' clinical findings, which the ALJ found to repeatedly document "appropriate grooming/attire, good eye contact, calm and cooperative behavior, appropriate responses to questions, linear and logical thought process, no reports/evidence of delusions/hallucinations/ suicidal ideation, average IQ based on vocabulary and interaction, fair-to-intact insight and judgment, intact remote and recent memory, no cognitive deficits, accurate serial sevens calculation, an intact impulse control." (*Id.* at 22 (citing records from MHC and vascular specialist, Dr. Alan Werner).) Besides finding that the "conclusions do not match the objective findings," the ALJ believed that some of the language in Berberich's reports was "copied and pasted from other patient's records, as evidenced in the misuse of pronouns (referring to 'his presentation' for the claimant)." (*Id.*) And finally, the ALJ found it significant that, although the plaintiff stated that she began seeing Dr. Berberich in 2018, the doctor wrote that he "identified the problems and their severity in 2017." (*Id.*)

## C.     The ALJ's Assessment of the Evidence

The regulations regarding the assessment of opinion evidence for claims filed on or after March 27, 2017 now provide that the Agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the Agency will consider all medical opinions in light of five factors: supportability, consistency, the provider's relationship with the claimant (which encompasses the length of the treatment relationship, the frequency of examinations, the purpose and extent of the treatment relationship, and whether the medical source actually examines the claimant as opposed to reviewing evidence in the claimant's medical files), area of specialization, and "other factors that

tend to support or contradict" the opinion. 20 C.F.R. § 404.1520c(c)(1)–(5). Because the most important of these factors are supportability and consistency, *id.* § 404.1520c(a), an ALJ is required to explain her consideration of these factors; she may, but is not required to, explain her consideration of the other factors, *id.* § 404.1520c(b)(2). The court finds that the ALJ did not adequately explain her consideration of the supportability or the consistency of Dr. Berberich's opinions with the other evidence in the record and, moreover, that her rejection of his opinions is not supported by substantial evidence in the record.

As an initial matter, "supportability" under the regulations means that medical evidence presented by a source to support their medical opinion should be "more relevant" in order to make the source's opinion more persuasive. 20 C.F.R. § 404.1520c(c)(1). Insofar as the ALJ appeared to believe that Dr. Berberich's opinion was less relevant because he had only been seeing the plaintiff since 2018, the record clearly reflects that he had been providing counseling for the plaintiff since 2016, meaning that Dr. Berberich a had long-standing treatment relationship with her. The *same ALJ* had considered the plaintiff's previous application for benefits and noted in her August 16, 2017 denial of benefits that Dr. Berberich had "indicated in his January 2017 evaluation" that "he had had only 4 prior visits with the claimant" at that point. (AR 67.) There are no relevant examining sources pertaining to the plaintiff's mental health, other than Dr. Berberich and the plaintiff's providers at MHC, and it is clear that Dr. Berberich's opinion is more relevant than those of the state agency reviewers.

Second, regarding consistency and credibility, while Dr. Berberich's records do erroneously refer to the patient by a male pronoun ("his presentation") in one section, this language appears in a section of the prepopulated Progress Note form that Dr. Berberich appears not to have actually completed or paid much attention to. As explained above, the same portion of the note

states "No" under nicotine use, identifies the patient's current health as "very good," and states her height as "0 ft 0 in," each of which was objectively untrue.[5] (*See* AR 494.) However, there is no evidence that the substantive portions of the treatment notes were cut and pasted from another patient's records. (*See, e.g.*, AR 493 (stating, in same treatment note, "Change is anathema for Ms. Martin.").)

Third, insofar as the ALJ relied on Dr. Alan Werner's treatment notes at all in support of her findings regarding the plaintiff's mental impairments, such reliance was misplaced. Dr. Werner is a vascular specialist whom the plaintiff saw briefly for complaints of bilateral foot and leg pain and numbness. Dr. Werner's notes indicate in one place that the plaintiff was "negative" for anxiety, depression, and sleep disturbances, but then the notes go on to recite a long list of mental health diagnoses in the "Medical History" section, including bipolar disorder, anxiety, PTSD, and "Depression Insomnia," as well as sleep apnea. (AR 357.) Dr. Werner ordered arterial studies and diagnosed some vascular issues. He was not called upon to assess or treat the plaintiff for any kind of mental health complaints.

Likewise, the ALJ's reference to the repeated indications in the records (from Dr. Werner but also from MHC and Dr. Berberich) that the plaintiff had appropriate hygiene and attire, good eye contact, calm and cooperative demeanor, linear thought processes, fair insight and judgment, and no hallucinations as inconsistent with Dr. Berberich's (and the plaintiff's own) description of the plaintiff's functional limitations is also not supported by the record. The fact that a severely depressed patient can pull herself together and present herself appropriately for a doctor's appointment does not substantiate a conclusion that she can consistently motivate herself to get

---

[5] This Progress Note is dated March 20, 2018. It was around this same timeframe that the plaintiff was referred for assessment by a vascular specialist and a sleep specialist.

out of bed and go to work on a regular basis. *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws."); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir. 2013) ("[T]he fact that Gayheart can sometimes go into public places (*i.e.*, his once-a-month shopping trips with his wife) does not contradict [her therapist's] opinion that Gayheart's general inability to be in public places significantly restricts what he can do on a day-to-day basis."). And the absence of hallucinations is not particularly relevant to diagnoses of bipolar disorder with severe depression, PTSD, and anxiety.

Most importantly, the ALJ's review of the treatment notes from Dr. Berberich and MHC clearly amounts to cherry-picking. The ALJ represents the plaintiff's treatment records as "document[ing] good response to medication without adverse side effects through February 2018," with "medication adjustments" beginning in March 2018, contemporaneously with "situational stressors," but that the plaintiff "stated she was doing better and denied primary stressors and suicidal ideation" by October 2018 and, in March 2019, "again stated she was doing okay." (AR 21.) As documented in the summary of her medication management at MHC, above, the ALJ's assertion that the plaintiff's records document good response to medication through February 2018 is simply untrue. As summarized above, the plaintiff repeatedly reported that her medications were not working, and her medications were repeatedly adjusted, from before her alleged disability onset date up through the date of the ALJ hearing in June 2019. Moreover, while it is true, as the ALJ noted, that she reported during a brief case management appointment at MHC in October 2018 that she was "doing better" and "attempting to remain medication compliant" (AR 475), by December she reported to her medical provider at MHC that she was experiencing more panic attacks, feeling more depressed, anxious, and irritable, and having suicidal ideation without a plan.

(AR 476.) Likewise, while she stated that she was "doing okay" and "attempting to cope better with anxiety" during a brief March 5, 2019 visit with her case manager at MHC (AR 480), at the meeting with her medical provider at MHC the same day, she continued to report difficulty sleeping and depression with decreased energy and motivation, and her medications were increased again (AR 481–82). She remained essentially the same, and her medical practitioner continued to change her medication and dosing, to no avail, over the next few months, as discussed above.

These treatment records from MHC are not inconsistent with Dr. Berberich's counseling notes. And the two instances in which the plaintiff indicated she was doing "okay," over the course of two years, do not provide substantial evidence to support the ALJ's determination that she was not as impaired as she claimed to be. *Accord Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) ("Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."); *see also Holohan*, 246 F.3d at 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

The ALJ's findings that Dr. Berberich's opinions were "neither well supported nor well explained" and were "internally inconsistent because he assesses severe limitations but diagnoses mild impairments" (Doc. No. 18, at 8) are also not supported by the portions of the record to which the ALJ cites. While the ALJ claims that Dr. Berberich assessed "severe" limitations but diagnosed "mild" impairments, she does not actually identify what severe limitations were mismatched with mild impairments. She broadly cites to the entirety of Dr. Berberich's treatment notes. The only

pinpoint cite she references (Ex. B6F/2–3 (AR 344–45)) simply shows that Dr. Berberich found that some aspects of the plaintiff's condition were mild or moderate while others were more severe.

In sum, the court finds that the ALJ's assessment of Dr. Berberich's testimony as not well supported, internally inconsistent, and inconsistent with the other treatment records is not supported by substantial evidence in the record.

### D. The ALJ's Assessment of the Plaintiff's Testimony

The ALJ stated as follows regarding the plaintiff's own testimony regarding her functional impairments:

> The claimant alleges difficulty with memory, concentration, and decision-making. She reports anxiety with leaving home and being in a crowd with up to two panic attacks per day. She says she is exhausted frequently, takes a lot of medication, struggles to get out of bed, and stays in her pajamas. . . .
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .

(AR 20.)

The ALJ found the plaintiff's statements regarding her insomnia to be inconsistent with the treatment records, because the plaintiff reported "improvement with treatment" after she was prescribed a CPAP for sleep apnea (Ex. B16F) and, in January 2019, stated that she was sleeping from six to twelve hours per night (Ex B17F/12). This assessment of the record ignores that the plaintiff reported in January 2019 that she was not actually using the CPAP machine and in February reported she was able to use it for only 30 minutes per night. Moreover, the reduction in the medication Remeron around that time, which was causing hunger and weight gain, had decreased her appetite but also increased her insomnia. (AR 481.) In April 2019, she was still "not sleeping." (AR 483.) In other words, the ALJ cited one instance in which the plaintiff's condition

appeared to be slightly improved in one aspect but failed to recognize the complete context of the statement or to address whether it is an anomaly. In a similar fashion, the ALJ highlighted the plaintiff's statements that she was "doing better" in October 2018 and "doing okay" in March 2019. (AR 21.) These instances do not show a pattern of consistent improvement, as already discussed above.

The ALJ found the plaintiff's allegations of disabling depression to be inconsistent with the plaintiff's ability to perform certain activities of daily living, such as preparing simple food, doing basic housekeeping and laundry, shopping in stores, counting change and using a checkbook, and "enjoy[ing]" coloring, watching television, and playing the piano. (AR 21.) In fact, the plaintiff stated that she can microwave frozen meals, that it typically takes her all day to perform two simple tasks, that she grocery shops once or twice a month but only if accompanied by her boyfriend or daughter, that she can count change and use a checkbook but rarely does so and does not pay bills, and that she only infrequently engages in coloring or playing the piano. The ALJ fails to explain how these limited activities are inconsistent with the plaintiff's allegations of crippling levels of depression and anxiety. The plaintiff's own account of her abilities and activities is entirely consistent with the description of her condition contained in the treatment records discussed above and in the letters submitted to the Agency by her boyfriend and daughter. The plaintiff's boyfriend, Andrew Turner, had lived with the plaintiff for ten years, over the course of which he had witnessed her condition decline. He stated that she spent most days in her pajamas, that her sleep schedule alternated between days without sleeping and excessive sleeping, and that she rarely left the house. (AR 210–11.) Her daughter had also watched her mother's downward spiral and described her struggles and decline over the course of several years. (AR 209.)

The Sixth Circuit's decision in *Gayheart v. Commissioner of Social Security*, 710 F.3d 365 (6th Cir. 2013), supports the principle that an ALJ should not take a disability claimant's statements out of context and should fairly consider other examples and statements in the record that are consistent with the claim of disability. *See Gayheart*, 710 F.3d at 377 ("The record, according to the ALJ, is clear that Gayheart's 'alleged anxiety has not prevented him from leaving home, driving, keeping medical appointments, visiting friends and neighbors, shopping with his wife, and attending three hearings.' Although not clearly stated, the apparent implication is that these activities are inconsistent with the social and daily living restrictions noted in Dr. Onady's opinions. But the ALJ does not contend, and the record does not suggest, that Gayheart could do any of these activities on *a sustained basis*, which is how the functional limitations of mental impairments are to be assessed." (emphasis in original)). As in *Gayheart*, the limited activities referenced by the plaintiff and cited by the ALJ do not provide substantial evidence that the plaintiff could actually perform work activity on a sustained basis. *See also Miller v. Commissioner*, 811 F.3d 825, 838 (6th Cir. 2016) ("Although the ALJ may properly consider [a plaintiff's] household and social activities when evaluating a claimant's assertions of pain or ailments, the ALJ must establish that [the plaintiff] could have performed such activities on a sustained basis when assessing [his] mental impairments." (internal quotation marks and citations omitted).[6]

The court finds that ALJ's assessment of the plaintiff's testimony is not supported by substantial evidence in the record.

---

[6] It appears that this ALJ would never find severe, chronic depression with anxiety to be disabling unless the claimant were completely catatonic.

### E. Whether to Award Benefits

The record viewed in its entirety documents the plaintiff's chronic, intractable, treatment-resistant bipolar disorder/depression with anxiety and insomnia. The ALJ failed to account for the plaintiff's sustained and basically unremitting symptoms, and her determination that the plaintiff was not disabled, based on her rejection of Dr. Berberich's opinions and adoption of the State Agency opinions regarding the plaintiff's mental health impairments, instead, is not supported by substantial evidence.

When a non-disability determination is not supported by substantial evidence, the court must decide whether to reverse and remand the matter for rehearing or to reverse and order that benefits be awarded. The court has authority to affirm, modify or reverse the Agency's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 100 (1991). Generally, "[b]enefits may be awarded immediately if all essential factual issues have been resolved, 'the proof of disability is strong, and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming.'" *Wilson v. Comm'r of Soc. Sec.*, 783 F. App'x 489, 505 (6th Cir. 2019) (quoting *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 438 (6th Cir. 2013)).

The court finds that the evidence of disability in this case is strong, and the opposing evidence is completely lacking in substance. Remand, as a result, would serve no purpose other than delay. As fully recited here, in view of the extensive treatment record evidencing disabling depression and anxiety, and the credible and well-supported findings and opinions of Dr. Berberich, the Agency failed to meet its burden of showing that its decision that the plaintiff is capable of engaging in substantial gainful activity is supported by substantial evidence.

**IV.    CONCLUSION**

For the reasons set forth herein, the court rejects the Magistrate Judge's conclusion that substantial evidence supports the ALJ's non-disability determination. The court will enter an order vacating the ALJ's determination, granting the plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 17), and awarding DIB from her alleged onset date of August 16, 2017, subject to any applicable regulatory waiting period.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge